We have three cases on the oral argument calendar for the morning. The first is cause number 16-60333, Adams and Associates v. NLRB. Is the appellant ready to proceed? Yes, sir. All right. Pelley? Yes, sir. All right. You may proceed. May it please the Court, Your Honors, Michael Paderni on behalf of Petitioner and Cross-Respondent Adams and Associates, Inc., along with co-petitioner McConnell, Jones, Lanier, and Murphy, we request five minutes for rebuttal. Adams and Associates, Inc. respectfully asks that this Court reverse the order issued by the National Labor Relations Board. In our petition, we specifically raised five issues with the order that was issued by the NLRB. I'm going to address two of those issues, specifically the issue as to whether the NLRB erroneously found that Adams and Associates, Inc. violated Section 883 of the National Labor Relations Act by not hiring five of the alleged discriminatees. And I'll address the second issue, which is whether Adams and Associates, Inc. was a perfectly clear successor under the National Labor Relations Board and thereby required to adopt the terms and conditions of the preceding collective bargaining agreement that was entered into between Adams' predecessor and the incumbent union. Respectfully, Your Honors, we believe that the NLRB erroneously issued, erroneously decided both of those issues. Mr. Washington will be addressing the issues of joint employer. The other two issues we feel were, have been briefed fully. So with respect to the first issue, we don't believe there's substantial evidence that the NLRB erroneously found that Adams and Associates, Inc. violated Section 883 of the National Labor Relations Act by not hiring five of the alleged discriminatees on the basis of any desire by the company to avoid union recognition. The board's conclusion is essentially based on alleged after-the-fact statements made by Roy Adams, the CEO of the company. While the board, in its order, states that the reasons for the company's decisions not to hire the five alleged discriminatees were patently pretextual, that conclusion as far as what was patently pretextual is all driven by Mr. Adams' after-the-fact statements. If you take away Mr. Adams' after-the-fact statements, it's not patently pretextual. Why would you take away a statement by the defendant as to what he intended to do, which was to prevent the union? Well, Mr. Adams was not involved in the hiring. He was not a decision-maker. He is the CEO of the company. But the hiring decisions were made by Jim Gagnon and by Valerie Weldon, all of whom – The CEO is not an agent? He's an agent of the company. That is – I don't think he's a – okay, are you arguing non-attribution? I guess I don't follow your argument. As I read this record, it was a concerted effort by these people to escape the union. He chastises employees for failing to carry out their mission of selectively hiring these people so as to avoid the union. Now, tell me what I'm missing in that. The facts, the key facts that rebut the order provided by the board is that Valerie Weldon, the general counsel's witness for the NLRB, she expressly stated she never received any on union considerations. Well, I said it was a substantial record of evidence for the board to decide what it did. Well, it's – It's not the noble review. That's correct. It's whether there is substantial evidence, and we respectfully don't believe there is. We believe that the board's decision is based on conjecture and speculation. So the argument is just a factual one. to infer the hiring and a union. There's no law that you're saying was misapplied. This is a substantial evidence. It wasn't a tweet. It was not a tweet. No, Judge Higginbotham, it was not a tweet. Rather, it was an expression after the decision was ultimately made. And again, he was not part of the hiring considerations. The key players in this, all of the folks responsible for hiring, they deny getting any sort of direction or pressure from Mr. Adams whether or not to hire folks. And it is undisputed Adams did hire the majority of the union folks. It is undisputed that Adams recognized the union. It is undisputed that Adams proceeded to bargain with the union. The only thing on which the NLRB hangs its hat in making its decision is what Mr. Adams said afterwards, where he conveyed frustration over the fact that the union was hired. Right. He conveyed a lot. But again, you're not arguing that legally that can't be intemporally used. You're just trying to draw the distinction between him, CEO, and those that you claim had hiring authority. Correct. We're not saying that post-hiring state animus couldn't be used to infer hiring animus. Correct. Okay. Correct. The statements, that's evidence. But again, these are statements made by somebody who was not involved in the hiring decisions, who was not a key player, not a key actor in any of this. Again, Valerie Weldon, the one who is the general counsel's key witness on this, denies that that was made. Tiffany Pondy, Jim Gagnon, Kelly McGillis, every single person involved in the hiring decision denies any sort of direction or order for Mr. Adams pressuring them to make the decisions. And again, where I believe the evidentiary issue is here is all speculation and conjecture. It presupposes that Mr. Adams provided those directions and orders or some pressure on the hiring people not to hire the union representatives. There is no record evidence of that. It also presupposes and speculates that the people who made the hiring decisions were or instructions that were never given in the first place. So again, I think the case that we believe is most similar from this circuit is the Brown and Root decision that is identified in our briefs. I want to address the specific evidence on which the board finds that the employer's reasons for not hiring the employees at issue were pretextual. There's reference to, in the board's order, to what they call sanitization of documents. And in that, we're referring to, the board's referring to sanitation of a single document in which there was a reference made to the union post-hiring. And again, in that particular instance, we're talking about one record that was created after the decisions were made and it involved, and this was after the employer had hired the majority of the union folks, and after it had recognized the union. And the record evidence reflects that this document, referring to the reasons as to why Janester Taylor was not hired, this document, the reason that this union, why they asked that the document be cleaned up is because union considerations played no role in it, at least from Ms. Pogny's understanding and Ms. Weldon's consideration. There's also reference in the order as far as patently pretextual reasons, the fact that Kelly McGillis shredded one employee's interview form, Shannon Cousins Camara. In that instance, she made an initial evaluation. She got, after conducting the interview and doing that evaluation, she got additional feedback regarding the employee and specifically the representations that were made by the employee regarding her qualifications. And Lee Bowman advised Ms. McGillis that those... Why did she shred the records? She did because the information that Ms. Cousins Camara provided were false. And she wanted to do, and she did a new interview evaluation form reflecting the fact that she'd been provided dishonest information. So she believed the first evaluation form was no longer relevant. It was moot. So she eliminated the document. Again, that's her explanation. It's not patently pretextual. The reason the Board frames it as being patently pretextual is because of Mr. Adams' after-the-fact statements. And again, there's no nexus between Mr. and... Alito What does the record reflect about Adams Company's document retention policy? Did they eliminate other documents? No, this is... So one time. Yeah, this was one time. And what's reflected in the record is that this hiring process was unfortunately not as pristine as one would like because normally they have a month in transition to hire people. There's some timely opportunity to conduct interviews, provide offer letters, do the due diligence that's necessary. And that was particularly important in this case because they were trying to comply with not just your regular hiring laws, your anti-discrimination laws, but also with respect to the Service Contract Act and the executive order that applied because they were a federal government contractor and it was important that they comply with all these issues, that they have the appropriate documentation. In this instance, they had less than two weeks to do the entire process, only a few days to do the interviews of scores of employees at the particular site. So unfortunately, the record-keeping and the diligence with which the interviews were conducted was not what they had hoped for. I know you have a whole other issue and I'm going to ask one question just factually about a separate. Ms. Taylor, what reason other than animus could there have been for her being restricted access? For her being restricted access? Yes. It was... They had a policy in place that former employees were not allowed to be present at the site. Was she a former employee of Adams? Not of Adams, but of Horizons Youth Centers, the predecessor. So while she was not an employee of Adams, the particular entity, she was a former employee at that particular site. That's why they made the initial instruction that they did. Okay. So they applied a policy to a former employee that wasn't a former employee. That's difficult. It may be misinterpretation of their rule, but that doesn't make it pretextual or unlawful under the National Labor Relations Act. Okay. Go ahead. You have that other issue. All right. And so again, I want to summarize that the board's patently pretextual findings all hang their hat on this notion that what Mr. Adams said must have been in the minds of the people making the hiring decisions in the first place. And I just want to make sure because I thought you... I understand that the time period for getting all this done was a very truncated time period. They had a Federal Government contract and so they had to make a lot of decisions very fast. But is that your justification for the fact that records got eliminated and sanitized? Is that what that was in connection with? No, no, no. Not necessarily. With respect to the... With respect to the one record that was eliminated, that was due to the fact that the information in the evaluation form was not fully accurate in that after receiving additional information after the initial interview, she was not telling the truth. What was the inaccuracy? I beg your pardon, Judge? What was the inaccuracy? That she had been named the Dorm of the... Her dorm had been... won the Dorm of the Year award on several occasions. Lee Bowman advised Kelly McGillis that was not in fact the case. So in light of getting that new information... You would think if someone misstates something you want to keep a record of that as opposed to eliminate the false statement. That's certainly one approach. That certainly would be best practice. Right. In this instance, that may not have been utilized but that doesn't make the hiring decision or that doesn't necessarily create evidence of union animus. So very briefly moving on to the second issue, we believe this issue is briefed in large detail but it's curious the connection that the General Counsel wants to make here that on the one hand, the company has this anti-union animus but on the other hand, it's telling all of the... telling a group of selected Horizons employees that they're doing a great job and they want to be hired. They told them that they were instituting new staffing ratios which concern the union. I realize that I'm out of time if you'll let me... You may complete your response. Yes. Very briefly, they advised that there would be changes. Changes in the staffing ratio. They'd be applying the benefits offered by Horizons and Adams. These are new conditions. So at no point in time does the record reflect that Adams told these folks essentially  the union and we're going to adopt the Horizons CBA. So for those reasons, we think the board's 8A5... 8A5... 8A5... 8A5... order is not supported by substantial evidence. Thank you, Your Honors. All right. Mr. Washington. Hey, B. Please, the court. On behalf of McConnell, Jones, Lanier,           is not supported by substantial evidence. Third, the NOLB's order is not supported by substantial evidence. And finally, the NOLB's order is not supported by substantial evidence and that is that for the joint employee issue, Adams is a subcontractor for MJLM. That's the prime. The substantial evidence does not exist to show that MJLM had sufficient control over Adams' employees that affected the essential terms      of directing or controlling employment matters for Adams' employees. The NOLB's order is not supported by substantial evidence. And finally, the NOLB's order is not supported by substantial evidence that Adams basically was the ultimate decision-maker for those employees for hiring and firing and discipline, et cetera. Thirdly, MJLM never participated in the collecting bargaining negotiations with Adams for those employees. In fact, Adams came up with the titles  coordinators, something that was new to the center. And as the court is well aware, this was a ten-day transition window of sorts for the residential coordinators to participate. Who determined who the center director would be? The MJLM. MJLM. Yeah. And then, did everybody else report to the center director? Reported to the center director for MJLM employees and Kelly McGillis for Adams' employees.    for MJLM, had been a long-time employee of Horizons. And it was a long-time employee of Horizons who was hired by Adams and her predecessor. Therefore, she had knowledge about the background of the employees that Adams was retaining to hire. The, one of the positions or points of the union and the NLRB is that representatives from MJLM participated in two or three of the interviews or had discussions about employing hiring. That's merely discussions. It was not the ultimate decision-making process. Jim Gagnon for Adams was the ultimate decision-maker. So, our contention is that Adams alone made its basis for who they would hire and who they would fire. Is there any law when the unfair labor practice alleged relates to hiring is there and yet we're still trying to assess joint employer liability is it control as to the hiring decision or control as to the subsequent employee terms? In my belief it is control as to the hiring. It is control as to hiring. Lastly, one of the points that was touched on was the agreement between MJ Allen and Adams. Merely having a partnership agreement . Your time has expired so I will give you a moment to sum up recognizing you only had three minutes which didn't include any questions. You have 60 seconds. I would say the agreements relating to setting forth wage rates and whatnot are insufficient to demonstrate that there was joint employee. No actions and conduct. MJ Allen did not participate with him. It is our belief and the evidence shows that there was not a relationship that would rise to a joint employee relationship in this matter. Thank you. Good morning your honors. I'm going to start with the union avoidance scheme. I'll move into questions on perfectly clear successor. I'm sorry. I keep trying to tell myself that. I will. I apologize. Starting with the union avoidance scheme. As judge Higginson pointed out it is purely a factual contest. The challenge is a purely factual one. All of the arguments you just heard were presented to the ALJ and the board disagrees with the employers factual representations as to whether Gillis was discredited or Gagnon was discredited. All of the evidence has been considered by the board and rejected. Specifically the notion that these are after the fact statements and can't be discredited. It is a misstatement to say there was no direction to the lower level employees down from the CEO. There is an email that asks Weldon to explain after the hiring process to explain how it is that Roy Adams repeated emphasis on hiring sub RAs which are non-union jobs how is  Weldon had to explain you didn't hire enough of those people even though Roy repeatedly told you to how is it  you don't want to stay non-union those are lawful statements how did we fail to do I believe it is written after the fact it is not contemporaneous with the hiring you are drawing the inference from that they were fully aware before that he had this intent it says as Roy emphasized the sub RAs should have been hired over the unit employees this is not a matter of you have to glean somebody's intent it is clear this is one of those cases where there is demonstrable evidence it is not circumstantial and it also shows that the lower level officials were aware and the Adams disciplined several employees for not avoiding the union there were repercussions for their actions it is a little vaguer than the initial email that     non-union employees were not hired but it says that the union employees should have been hired over the unit so it says in broad terms that you didn't carry through with our process which was we wanted to avoid the union so they were disciplined for that purpose and then briefly I'd like to clarify a few things as it relates to the pretext the five employees about the pretext so the employer makes a lot to say they only shredded one document or one  and they say I don't know how far you can get by saying we only did it once for this person the whole scheme was to avoid the union and these events took place targeted at union jobs so we have Taylor again all of this comes down to the pretext is the same arguments they made to the board and that were rejected on evident ery grounds McGillis lowered Taylor's score changing it from a 2 to a 3 Taylor is the union president the ALJ specifically rejects McGillis's testimony in this regard as to why she did it so Cousins Kamara is the one who said during her interview I got I think it's dormitory of the month several times McGillis says McGillis accepts that and then later thinks well that doesn't seem she talks to Bowman and Bowman says that's not true and then she shreds the initial  creates another one but then at the hearing Lang testifies he was partnered with Cousins Kamara Lang testifies in fact Cousins Kamara did win this award several times so the judge relies on that and says the unrebutted testimony is that in fact Cousins Kamara testified in her interview was straightforward and accurately represented what her achievements were at the center win was another one who wasn't hired says that the employer says he slept on the job and stole the ALJ rejected the defense on credibility grounds Gagnon during the hearing couldn't remember what he was referring to when he said I fired him because he stole and he slept Lang was another one where they said we didn't hire Lang because there was a date discrepancy we couldn't confirm that the background let me ask one question what is the outcome of the whole proceeding they ended up with a union what is the precise relief in terms of hiring that the board ordered so the board ordered that the five people who were discharged under the new at will employment     they weren't privileged to make make all right so they ordered the employer not only to recognize the union but to make whole relief and then the board makes both MJLM and Adams jointly and severally liable for the violations there are a great deal of facts in the record and it's helpful to hear them but there are the bigger two legal issues and the successor rule are you going to reach those I can move into the perfectly clear successor the concern is putting the case against you how would one remark a reassurance to employees 99% of you will have a job but at the same time they were telling the NLRB and the employees we're going to be reducing creating new positions there's going to be a lot of flux I think the board talks about this in a footnote the employer makes that argument the employer says telling the employees we're reducing from 25 to 15 should have sufficiently let these people know two things the union wasn't going to stay the perfectly clear successor doctrine if they were only going to hire 15 can you still be a perfectly clear successor and the law is that the union's continued majority status is made people are led to believe this is a point where the ILJ disagreed the board says she used the wrong standard she didn't apply the correct law the law is not all employees not all employees the board says the bargaining obligation yes attached on February 13 when Gagnon got up in front of the employees and said I want a smooth transition you guys have all been great I want to clarify something I don't remember what it was the board said 99 percent certain they will all have a job at one point I wrote that 99 percent have a job that's not accurate what he said was 99 percent certain what's the answer  that question is there a job that is not accurate what's the answer to that question is 99 percent certain what's the answer to that question is there   that is not accurate  the answer to that question is there a job that is not accurate what's the answer to that question is 99 percent   the answer to that question is 99 percent certain what's the answer to that question is 99 percent certain what's the answer to that question . I'm asking you what if the person trying to reassure a nervous group said most of you. I don't    That would be for the board. I know that's not a satisfactory answer. I'm asking you what if the person trying to reassure a nervous group said most of  I know that's not a satisfactory  I'm asking you what if  person trying to reassure a nervous group said most of you. I know that's not a satisfactory answer. I'm asking you what if the person trying to reassure a nervous group said      answer.       reassure a nervous group said most of I know that's not a satisfactory answer. I'm asking you what if the person trying to answer the question is not a    if the person trying to answer the question is not a satisfactory answer? What if the person trying to answer the question is not a satisfactory answer?   the person trying to answer the question is not ulo answer the question is not a satisfactory answer? the  trying to answer the question is not a satisfactory answer? the question room chairs in the metal partition mechanism have repeatedly made us worried that we were going to have the job. We don't want to rock the boat. We want a smooth transition. As a union lawyer, I represent a lot of unions in the success of this process. When the union president stood up and said aren't our conditions going to change if there's only 15 of us, he said no, no, no, we've got a new system. You the bargaining system will not change. What does the case law say about this 99% versus 97%? We discussed in the brief, the Supreme Court's decision in fall river and the international association of machinists, it's clear that when it becomes clear that a majority will be hired, the bargaining obligation attaches. Could you give us best fact and best law? This is very straightforward. The proper mode of analysis is the hiring decision. This case is all about the hiring process. It's not about what happens after the facts in this case. That hiring process, it was totally clear that the two companies were working together. They put in the proposal to the Department of Labor together. The Adams deputy director reported to the director. In the hiring process, you had employees doing the interviews for Adams. They were doing the hiring together. Those are the basic factors. As a minimum, as to the unlawful hires, it should be held jointly and severally liable for those cases.  you're  at a case like this, you should look at the Department of Labor and the Department of Labor and the Department of Labor and the Department of Labor and the Department of Labor and the  of Labor   Department of Labor and the Department of Labor and the Department of Labor . In addition to doing the interviews with Adams, there was a change in  hiring process. The ALJ was entitled to make a finding  were statements made by Mr. Adams during the hiring process. Thank you, Your Honors. Rebuttal. Thank you, Your Honors. Going back to the issue about the after-the-fact statements. Again, all of the witnesses specifically denied getting instruction from Mr. Adams as to who to hire and whether to avoid union recognition. In the ALJ's decision, specifically pages 15-16 of the record excerpts, she credits Ms. Weldon's testimony as far as discussions  to hiring. At no point in the ALJ decision does she specifically state or even address the issue as to the testimony from Ms. Weldon, Mr. Gagnon, about not receiving specific information about who to hire and whether to avoid union recognition. With respect to the discipline that was issued after the fact, it's important to look at the actual disciplinary records here in the sense that it's not as though these people were disciplined for what was construed to be a failure with respect to union hiring. They're disciplined for what Mr. Adams considered to be an unsatisfactory hiring process altogether, regulatory compliance, compliance with the fact they had to bring in a bunch of people from Maryland to do the hiring. He said what is unsatisfactory about it is it triggered their obligation to bargain with the union. There's several, what he says, just reading it from it directly, I acknowledge that the transition period of Sacramento was compressed and challenging, but I still don't understand why three Maryland based HR staff were necessary to do the hiring and why you didn't observe some of the transition activity. And he goes through bullet points of everything he found to be objectionable in that process. I see I'm out of time. If I can make one point on the perfectly clear successor issue. It's important, the board's order with respect to perfectly clear successor doesn't apply a new standard or different standard from what the ALJ said. Rather what the board did is reinterpreted the meaning of what Mr. McLaughlin  If there was a change from the perspective of the employees there would be changes to their terms and conditions of employment. The ALJ found that that alone was sufficient to not make the employer perfectly clear successor. The board decided it was sufficient. I want to bring up that point of clarification. Thank you. A very minor point of rebuttal. The opinion of council is that MJLM in some way teamed up with Adams to conduct all the interviews of the employees. And that's not true. What the facts are is that two to three employees were interviewed by MJLM representatives. And at the end of the day, ultimately, that information was discussed with Jim Gagnon, who made the ultimate decision, who was Adams' employee. Again, this is because we're in that short time period, transition period, that they assisted in that interview, gave the information to Mr. Gagnon, who was Adams' representative, and Adams made the ultimate decision. Thank you.